IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Craig B. Shaffer

Civil Action No. 13-cv-01968-CBS

TRINA M. RAEL,
    Plaintiff,
v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,
    Defendant.

## MEMORANDUM OPINION AND ORDER

This civil action comes before the court pursuant to Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 1381-1383f, for review of the Commissioner of Social Security's final decision denying Ms. Rael's application for Supplemental Security Income benefits ("SSI"). Pursuant to the Order of Reference dated May 19, 2014, this civil action was referred to the Magistrate Judge "for all purposes" pursuant to the Pilot Program to Implement the Direct Assignment of Civil Cases to Full Time Magistrate Judges and Title 28 U.S.C. § 636(c). (*See* Doc. # 27). The court has reviewed the Complaint (filed July 24, 2013) (Doc. # 1), Defendant's Answer (filed November 1, 2013) (Doc. # 10), Plaintiff's Opening Brief (filed January 13, 2014) (Doc. # 15), Defendant's Response Brief (filed April 23, 2014) (Doc. # 20), Plaintiff's Reply Brief (filed May 7, 2014) (Doc. # 21), the entire case file, the administrative record (filed November 1, 20130 (Doc. # 11), and the applicable law and is sufficiently advised in the premises.

1

I.     Procedural History

Ms. Rael filed an application for SSI with a protective filing date of March 4, 2008. (*See* Administrative Record, Doc. # 11-5 at 2 of 13, Doc. # 11-6 at 2 of 43).[1] She claimed that she became disabled on March 4, 2008 based on sleep apnea, allergies, carpal tunnel, diabetes, depression, anxiety, and lung problems. (*See* Administrative Record (Doc. # 11-6 at 6 of 43)).[2] The claim was denied at the initial determination stage on December 30, 2010 and Ms. Rael requested a hearing. (*See* Disability Determination and Transmittal (Doc. # 11-3 at 2 of 17, Administrative Record (Doc. # 11-4 at 8 of 43)). Administrative Law Judge William Musseman ("ALJ") held a hearing on April 2, 2012. (*See* Transcript (Doc. # 11-2)). Ms. Rael was represented by counsel and testified at the hearing. (*See id.;* Appointment of Representative (Doc. # 11-4 at 6 of 43)). Mr. Bruce Magnuson testified at the hearing as a vocational expert ("VE"). (*See* Doc. # 11-2). The ALJ issued his written decision on April 23, 2012, concluding that Ms. Rael had no past relevant work and was not disabled under the Act because based on her "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." (*See* Decision (Doc. # 11-2) at 23 of 45).

On May 30, 2012, Ms. Rael requested review of the ALJ's decision by the Appeals Council. (*See* Request for Review of Hearing Decision/Order (Doc. # 11-2 at 7 of 45)). The Appeals Council denied Ms. Rael's request for review on June 4, 2013. (*See* Notice of Appeals

---

[1] To qualify as an effective claim, an application for SSI benefits must be submitted on a prescribed form. 20 C.F.R. § 404.610. However, a written statement indicating a person's intent to claim benefits can, if it meets certain requirements, establish a protective filing date. *Id.* § 404.630.

[2] Although she initially alleged disability beginning on March 4, 2008 in her application, she also stated in a "Disability Report" form that her conditions became severe enough to prevent work beginning on September 1, 2009, but that she actually had stopped working on June 1, 2006 for reasons unrelated to disability. (See Doc. # 11-6 at 6 of 43). In the same Disability Report form, she also stated that she worked as a home health caregiver from May 2004 through the "present" (*See id.* at 7 of 43).

2

Council Action (Doc. # 11-2) at 2 of 45). The decision of the ALJ then became the final decision of the Commissioner. 20 C.F.R. § 416.1481; *Neilson v. Sullivan*, 992 F.2d 1118, 1119 (10th Cir. 1993) (citation omitted). Ms. Rael filed this action on July 24, 2013. The court has jurisdiction to review the final decision of the Commissioner. 42 U.S.C. § 405(g).

II.     Standard of Review

In reviewing the Commissioner's final decision, the court must "closely examine the record as a whole to determine whether the . . . decision is supported by substantial evidence and adheres to applicable legal standards." *Berna v. Chater*, 101 F.3d 631, 632 (10th Cir. 1996) (internal quotation marks and citation omitted). *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (court "must determine whether the . . . decision of nondisability, . . . is supported by substantial evidence, *i.e.*, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion") (internal quotation marks and citation omitted). The court "must affirm . . . if the decision is supported by substantial evidence." *Eggleston v. Bowen*, 851 F.2d 1244, 1246 (10th Cir. 1988) (citing 42 U.S.C. § 405(g)). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir.1988). The court "may neither reweigh the evidence nor substitute [its] judgment for the [Commissioner's]." *White v. Massanari*, 271 F.3d 1256, 1260 (10th Cir. 2001). *See also Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) ("The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.") (internal quotation marks and citation omitted); *Mounts v.*

*Astrue*, No. 11-1172, 479 F. App'x 860, 867 (10th Cir. May 9, 2012) (court cannot reweigh the evidence and come to a different conclusion than the ALJ) (citation omitted).

An individual's eligibility for SSI payments shall be determined on the basis of the individual's income, resources, and other relevant characteristics. 42 U.S.C. § 1382(c)(1). In addition to being financially eligible, the individual must file an application for SSI and be under a "disability" as defined in the Act. 42 U.S.C. § 1382. An individual "shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); § 1382c(a)(3)(B).

The Commissioner has developed a five-step evaluation process for determining whether a claimant is disabled under the Act. *See Williams*, 844 F.2d at 750-52 (describing the five steps in detail). "If a determination can be made at any of the steps that a claimant is not disabled, evaluation under a subsequent step is not necessary." *Id.* at 750. At step four of the evaluation process, an ALJ must determine a claimant's Residual Functional Capacity (RFC). The RFC is what a claimant is still "functionally capable of doing on a regular and continuing basis, despite [her] impairments; the claimant's maximum sustained work capability." *Williams*, 844 F.2d at 751. "The claimant bears the burden of proof through step four of the analysis." *Neilson*, 992 F.2d at 1120.

At step five, the burden shifts to the Commissioner to show that a claimant can perform work that exists in the national economy, taking into account her RFC, age, education, and work experience. *Neilson*, 992 F.2d at 1120.

> . . . The decision maker first determines the type of work, based on physical exertion (strength) requirements, that the claimant has the RFC to perform. In this

> context, work existing in the economy is classified as sedentary, light, medium, heavy, and very heavy.  To determine the claimant's "RFC category," the decision maker assesses a claimant's physical abilities and, consequently, takes into account the claimant's exertional limitations (i.e., limitations in meeting the strength requirements of work). . . .
>
> If a conclusion of "not disabled" results, this means that a significant number of jobs exist in the national economy for which the claimant is still exertionally capable of performing. . . . The decision maker must then consider all relevant facts to determine whether the claimant's work capability is further diminished in terms of jobs contraindicated by nonexertional limitations.
> . . .
> Nonexertional limitations may include or stem from sensory impairments; epilepsy; mental impairments, such as the inability to understand, to carry out and remember instructions, and to respond appropriately in a work setting; postural and manipulative disabilities; psychiatric disorders; chronic alcoholism; drug dependence; dizziness; and pain. . . .

*Williams*, 844 F.2d at 751-52. (citations omitted).

III.   Analysis

Ms. Rael was born in 1963, graduated from high school, attended college, and received specialized job training as a heavy equipment operator (*See* Disability Report (Doc. # 11-6) at 7 of 43).  She is right hand dominant  (*See* Transcript (Doc. # 11-2) at 38 of 45).  She has a sporadic record of working as a sales clerk, a seamstress, a kitchen aid, an assembly worker, and a home health caregiver.  (See Doc. # 11-2 at 42 of 45,  Doc. # 11-6 at 7 of 43).

Ms. Rael lives with two teen-aged daughters.  She drives, does some laundry, ironing, and dishes, shops for groceries and other supplies, cooks daily simple meals, does a little house and yard work, and attends medical appointments, church, and prayer group.  (*See* Doc. # 11-6 at 18-21, 27-28 of 43, consultative exam report (Doc. # 11-8) at 115-17 of 117).  She occasionally socializes with family and friends.  (*See* Doc. # 11-6 at 30 of 43, Doc. # 11-8 at 116 of 117).  She can walk two blocks and tries to walk daily unless it is too warm.  (*See* Adult

5

Function Report, Adult Third Party Function Report, Doc. # 11-6 at 17, 19 of 43). She monitors her own medications. She is capable of managing her finances. (*See* Doc. # 11-6 at 19, 29 of 43, consultative exam report (Doc. # 11-8) at 116-17 of 117). She reads, watches television, talks on the phone, and occasionally goes out to eat. (*See* Doc. # 11-6 at 30 of 43).

Ms. Rael has a history of allergies and anxiety, treated with medication by her family physician, and sleep apnea, fully treated with a CPAP machine. (*See* Doc. # 11-8 at 41, 47, 76, 97-100 of 117, Doc. # 11-9 at 58, 61 of 85). She is a smoker, is diabetic, is obese at five feet three inches in height and recorded weight of approximately 200 pounds, and has repeatedly been advised to lose weight. (*See* Doc. # 11-2 at 4 of 11, *see also e.g.,* Doc. # 11-7 at 4, 20, of 103, Doc. # 11-8 at 50, 76, 78-80, 82-85, 87, 97, 99, 101, of 117, Doc. # 11-9 at 3, 55, 57, 76-77 of 86).

Ms. Rael had a hysterectomy on May 26, 2009 (Doc. # 11-7 at 79 of 103). In an April 2009 consultation for an unrelated medical issue, Ms. Rael's physicians incidentally found an asymptomatic left atrial myxoma.[3] (*See* Doc. # 11-7 at 14-15, 22-23 of 103, Doc. # 11-8 at 19, 47-52 of 117). On September 23, 2009, she underwent minimally invasive surgery for removal of the myxoma. (*See id.* at 14-18, 27, 29-40, 45-52, 106, 108 of 117; Doc. # 11-9 at 20-39, 46, of 86 (same)). After the surgery, Ms. Rael experienced some left-sided facial weakness and speech difficulties. (*See* Doc. # 11-8 at 35 of 117). An MRI of her brain showed a subacute[4]

---

[3] A benign cardiac tumor which can cause problems if left untreated. *See* Response Brief (Doc. # 20) at 3 of 29 n. 2 (citing Merck Manual, The, Cardiac Tumors).

[4] A condition "less marked in severity or duration than a corresponding acute state." See Doc. # 20 at 4 of 29 (citing Merriam-Webster MedlinePlus Medical Dictionary).

ischemia[5] in some areas of the right hemisphere of her brain with no evidence of hemorrhage, leading to the assessment that she had a stroke during surgery. (*See* Doc. # 11-8 at 29 of 117).

In postoperative follow-up with cardiologist John Mehall, M.D. on October 13, 2009, Ms. Rael was "overall markedly improved." (*See* Doc. # 11-8 at 45 of 117). "From a cardiac standpoint she has done excellent. . . .Her facial droop is mild and probably unnoticeable to the unknowing observer. Her speech is readily understandable, however, it is different from pre op." (*See* Doc. # 11-8 at 45 of 117). Dr. Mehall recommended speech therapy. Postoperative findings by Michael Hansa, M.D., a cardiac specialist of Pueblo Cardiology Associates, also indicated that Ms. Rael was "doing well." (*See* Doc. # 11-8 at 101-106 of 117). Ms. Rael was discharged from speech rehabilitation in February 2010. She had often canceled, failed to attend, or otherwise cut her appointments short, reporting that she was "too busy to work on this." (*See* Doc. # 11-8 at 63-73 of 117). Despite her "limited" participation, she had met her speech therapy goals by February 2010. (*See id.* at 63 of 117).

The medical records indicate that from October 2009 through January 2012 Ms. Rael occasionally sought treatment from Cheryl Wills, D.O., James F. Pagel, M.D., and the Southern Colorado Clinic, P.C. for congestion and nasal drainage, ear pain, abdominal pain, skin rash, cholesterol, hand numbness, urinary incontinence, wellness exam, sinus problems, toenails, sore throat, and continuing sleep treatment. (*See* Doc. # 11-8 at 41-44, 59-62, 74-75, 78-79, 81-85, 87, 97-100 of 117, Doc. # 11-9 at 57-63, 73-74 of 86).

Following the five-step evaluation process, the ALJ determined that: (1) Ms. Rael had not engaged in substantial gainful activity since the application date, March 4, 2008, (2) she had

---

[5] A "deficient supply of blood to a body part . . . that is due to obstruction of the inflow of arterial blood." See id., "ischemia," available at http://www.merriam-webster.com /medlineplus/ischemia (last accessed Apr. 18, 2014).

severe impairments of "right carpal tunnel syndrome, obesity, depression," and "a nonspecific cognitive disorder," (3) she did not have an impairment or combination of impairments listed in or medically equal to one listed in Title 20, Chapter III, Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926), (4) she has the RFC "to perform light work as defined in 20 CFR § 416.967(b)," with certain limitations and (5) "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (*See* Doc. # 11-2 at 18, 23 of 45). Ms. Rael challenges the ALJ's determination at step four of the evaluation process, claiming that the ALJ erred by: (1) failing to state the RFC finding on a function-by-function basis, (2) failing to weigh the opinion of a consultative examiner, Mr. Valette, (3) improperly weighing a treating physician's opinion, and (4) failing to assess the opinion of her mother. (*See* Complaint (Doc. # 1) at 2 of 2, Opening Brief (Doc. # 15) at 17-18 of 40). Ms. Rael also appears to challenge the ALJ's determination at step five of the evaluation process, claiming that the ALJ erred by failing to properly assess the significance of the occurrence of jobs. (*See id.*).

A.   Function-by-Function Assessment

Ms. Rael alleges that the ALJ erred by failing to state the RFC finding on a function-by-function basis. (*See* Doc. # 1 at 2 of 2, Doc. # 15 at 17-18 of 40). In deciding that Ms. Rael is capable of performing light work as defined in 20 CFR § 416.967(b), the ALJ had to determine her RFC "based on all the relevant medical and other evidence" in the case record. 20 C.F.R. § 416.920(a)(3). RFC determinations are for the ALJ to make "based on the entire case record, including the objective medical findings and the credibility of the claimant's subjective complaints." *Poppa v. Astrue*, 569 F.3d 1167, 1170-71 (10th Cir. 2009). *See also* 20 C.F.R. §

416.946 (providing ALJ is responsible for assessing RFC). At step four, the ALJ found that Ms. Rael had the RFC "to perform light work as defined in 20 CFR 416.967(b)" limited to "frequent rather than constant bending, squatting and kneeling," and occasional "pushing, pulling, handling and fingering," and "she should not perform complex tasks," that is, "she would be restricted to jobs of SVP2 or less." (*See* Doc. # 11-2 at 18 of 45).[6]

Pursuant to the Social Security Regulations, an ALJ's assessment of the claimant's RFC must include a function-by-function analysis of the claimant's functional limitations or restrictions and an assessment of the claimant's work-related abilities on a function-by-function basis. *See* Social Security Ruling 96–8p, 1996 WL 374184, at *3 (providing that "[t]he RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities."). With regard to physical limitations, this means the ALJ must make a function-by-function assessment of the claimant's ability to sit, stand, walk, lift, carry, push, or pull. SSR 96–8p, 1996 WL 374184, at *5. Once the function-by-function analysis is completed, the RFC may be expressed in terms of exertional levels of work, *e.g.*, sedentary, light, medium, heavy, and very heavy. *Guana v. Astrue*, No. 11-cv-02781-LTB, 2013 WL 316022, at * 5 (D. Colo. Jan. 28, 2013). The Ruling states that a function-by-function analysis is also important at step 5, when the ALJ determines whether there is other work that the claimant could do by applying the Medical–Vocational Guidelines. *See id.* Without a function-by-function analysis, an ALJ "may ... overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do." *Id.* at *4.

---

[6] SVP refers to "Specific Vocational Preparation," which is defined as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." Dictionary of Occupational Titles (DOT) Appendix C (4th rev. ed.1991), 1991 WL 688702.

In this case, the ALJ gave partial weight to the opinion of Ms. Rael's treating physician, Dr. Kunstle, that she had no limitations in sitting, standing, or walking and "no difficulties sitting or remaining on her feet throughout the day." (*See* Doc. # 11-2 at 8-9 of 11 (citing Doc. # 11-9 at 2-6 of 86 ("There are no recommended limitations on the number of hours the patient should be able to sit, stand, or walk. There are no recommended postural limitations.")), Doc. # 11-9 at 66-67 of 86). The ALJ also gave partial weight to the assessment of the State agency physician, Dr. Canham, that Ms. Rael could do light work "that involved occasional pushing, pulling and handling, . . . occasional climbing of ladders, ropes or scaffolds," and "frequent performance of all other postural activities." (*See* Doc. # 11-2 at 21 of 45, Doc. # 11-3 at 10-12 of 17). The record indicates that the ALJ adequately evaluated Ms. Rael's physical abilities on a function by function basis to determine her RFC.

Even if the ALJ had failed to make an explicit function-by-function analysis, the omission was not critical to the outcome of this case and Ms. Rael has not demonstrated error. While "a function-by-function analysis is desirable, it is not an absolute requirement if the rationale for the ALJ's RFC assessment can be readily discerned." *Walters v. Astrue*, No. 11-CV-640 (VEB), 2013 WL 598331, at * 4 (N.D.N.Y. Feb. 13, 2013 ) (collecting cases). *See also Keyes–Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012) ("Where, as here, we can follow the adjudicator's reasoning in conducting our review, and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal. In conducting our review, we should, indeed must, exercise common sense.... [W]e cannot insist on technical perfection."). Because the rationale for the ALJ's determination of Ms. Rael's RFC is readily discernable. the court finds no error on this issue.

B.     Valette's Consultative Opinion

Although Ms. Rael did not receive any medical treatment between July 2010 and March 2011, she attended three agency-ordered consultative examinations during that time period. On October 13, 2010 and December 8, 2010, she met with Brett Valette, Ph.D., for a consultative mental status examination. (*See* Doc. # 11-8 at 115-17 of 117, Doc. # 11-9 at 12-13 of 86). He noted that she stumbled over words and appeared to have memory difficulties. (*See* Doc. # 11-8 at 115-17 of 117). He concluded she exhibited symptoms of major depression, cognitive difficulties, specifically in verbal comprehension, and mild difficulties in visual working memory. (*See* Doc. # 11-8 at 117 of 117, Doc. # 11-9 at 13 of 86). The ALJ noted the mental status evaluation in October 2010 and the neuropsychological testing performed two months later, but did not rely on the reports. (*See* Doc. # 11-2 at 17, 20, 21, 22, 23 of 45). The ALJ concluded that Ms. Rael had the RFC to perform unskilled light work. Ms. Rael alleges that the ALJ erred by "failing to weigh Dr. Valette's opinion" and by "attempting to account for plaintiff's specific mental health limitations by reducing the skill level of the work." (See Doc. # 21 at 11 of 23).

Non-treating source opinions that an ALJ addresses do not require any particular statement of weight. *See Retana v. Astrue*, No. 11-cv-00105-PAB, 2012 WL 1079229, at *4 (D. Colo. Mar. 30, 2012) (ALJ not required to state the weight given to consultative examining psychologist's opinion or "give good reasons" for this weight, rather, "[the ALJ] need only have considered" the opinion (quoting *McTaggart v. Astrue*, 342 F. App'x 373, 374 (10th Cir. 2009) (ALJ not required to explain the reasons for the weight given non-treating physicians in the report; he need only have considered them) and citing *Freeman v. Astrue*, 441 F. App'x 571, 574 (10th Cir. 2011) (ALJ not required to discuss weight given to opinion of doctors that did not qualify as treating physicians)). The ALJ considered Mr. Valette's opinion when he found at

11

step two that Ms. Rael's nonspecific cognitive disorder was a severe impairment, in the RFC assessment when he discussed mental status examination findings and diagnostic test results, and when he explained that the record as a whole supported a moderate restriction in concentration, persistence, and pace which would be accounted for by a limitation to simple, unskilled tasks. (See Doc. # 11-2 at 17, 20, 21, 22, 23 of 45). The ALJ did not err in failing to assign weight to Dr. Valette's evaluations. Moreover, the RFC formulated by the ALJ does not conflict with Mr. Valette's assessment of Ms. Rael or the other evidence in the record.[7] The court may not reweigh the evidence or substitute its judgment for the Commissioner's. *White*, 271 F.3d at 1260. The court finds no error on this issue.

C.  Dr. Kunstle's Opinion

Ms. Rael alleges that the ALJ erred by failing to properly weigh the opinion of her treating physician, John Kunstle, M.D., a family practitioner in Pueblo, Colorado. (See Doc. # 15 at 18 of 40, Doc. # 21 at 14 of 23). Dr. Kunstle treated Ms. Rael between March 2011 and February 2012. (*See* Doc. # 11-9 at 83 of 86). During that time period, she sought treatment from Dr. Kunstle six times: once to establish care, once with complaints of sinusitis, once for treatment of a toe hangnail, once for a mammogram, once to discuss diabetes and allergies, and once with complaints of sinus congestion and coughing. (*See* Doc. # 11-9 at 72-77, 86 of 86). In February and March of 2012, Dr. Kunstle completed two disability forms for Ms. Rael. (See Doc. # 11-9 at 66-68, 83-85 of 86). Dr. Kunstle opined that Ms. Rael could lift and carry 10 pounds for up to one-third of an eight hour work day. (*See* Doc. # 11-9 at 66 of 86). He further

---

[7] The court also notes that much of Mr. Valette's assessment is based upon Ms. Rael's subjective descriptions. (*See* Doc. # 11-8 at 115-17 of 117). Ms. Rael's subjective descriptions of her symptoms, alone, are not enough to establish a physical or mental impairment. 20 CFR § 416.928(a).

12

opined that she had no limitations in her ability to sit, stand, or walk in an eight hour work day, should never crawl, and should rarely do right-handed reaching, handling, or fingering. (*See id.* at 66-67 of 86). Dr. Kunstle also opined that Ms. Rael "is mentally capable of attending work at any job 8 hours per day, 5 days per week" if it were "preferably simple" work, but might be off task an estimated 20 percent of the work week. (See RFC Evaluation (Mental) (Doc. # 11-9) at 85 of 86).

The ALJ declined to assign controlling weight to the opinions Dr. Kunstle stated on the forms. The ALJ gave "partial weight" to Dr. Kunstle's opinions that were consistent with the medical and other evidence. (See Doc. # 11-2 at 21-22 of 45). He expressly rejected Dr. Kunstle's opinion regarding Ms. Rael's right hand limitations and lifting capability as inconsistent with the medical and other evidence. (See Doc. # 11-2 at 22 of 45). The ALJ expressly rejected Dr. Kunstle's opinion that mental impairments might cause Ms. Rael to be off task an estimated 25 percent of the work week because it was inconsistent with the medical record as a whole. (See Doc. # 11-2 at 22 of 45). He gave partial weight to Dr. Kunstle's opinion to the extent that Ms. Rael would be limited to simple tasks. The ALJ determined that Ms. Rael's cognitive condition "would limit her to the performance to simple, unskilled work." (See Doc. # 11-2 at 23 of 45).

"A treating physician's opinion must be given controlling weight if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." *Knight ex rel. P.K. v. Colvin*, 756 F.3d 1171, 1176 (10th Cir. 2014) (internal quotation marks omitted). "When a treating physician's opinion is not given controlling weight, the ALJ must explain what weight, if any, was assigned to the opinion

"using all of the factors provided in . . . 20 C.F.R. § 416.927."[8]  *Id.* at 1176–77.  The ALJ must give good reasons for the weight he assigns the opinion.  *Watkins*, 350 F.3d at 1301.

Here, the ALJ properly considered the relevant factors and articulated good reasons for declining to accord Dr. Kunstle's opinions controlling weight.  As the ALJ explained, Dr. Kunstle's opinions were inconsistent with the medical evidence in the record, such as the weakness in her upper right extremity, her minimal complaints to treaters, the findings upon physical examination, the in-depth psychological assessments, Ms. Rael's presentation at the hearing, her function report, and the results of neuropsychological testing.  (See Doc. # 11-2 at 19-20, 22-23 of 45, Doc. # 11-6 at 16-23 of 43, Doc. # 11-8 at 14, 78-96, 115-17 of 117, Doc. # 11-9 at 2-6, 11-13, 56-65, 69-82 of 86).  Because there was little evidence to support the opinions Dr. Kunstle stated on the two forms, the ALJ was entitled to discount those opinions.  *See Raymond v. Astrue*, 621 F.3d 1269, 1272 (10th Cir. 2009) (ALJ reasonably discounted treating physician opinion which was inconsistent with other medical evidence);  *Oldham v. Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007) (ALJ reasonably discounted physician opinions in light of other evidence of claimant's capabilities and is not required to "apply expressly" every relevant factor for weighing opinion evidence);  *Pisciotta v. Astrue*, 500 F.3d 1074, 1078 (10th Cir .2007) ("Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence." (internal quotation marks omitted);  *Branum v. Barnhart*, 385 F.3d 1268, 1275-76 (10th Cir. 2004) (upholding ALJ's rejection of treating physician's opinion because

---

[8]  Those factors are: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.  *Watkins v. Barnhart*, 350 F.3d 1297, 1300-01 (10th Cir. 2003) (internal quotation marks and citation omitted).

physician provided limited medical treatment of allegedly disabling condition). *White v. Barnhart*, 287 F.3d 903, 907-08 (10th Cir. 2002) (discrepancy between treating physician's very restrictive functional assessment and examination notes a legitimate factor for rejecting that opinion). The court concludes that the ALJ's decision to give lesser weight to the opinions of Dr. Kunstle is supported by substantial medical and other evidence in the record. The ALJ gave satisfactory reasons, tied to the appropriate factors, for the weight he assigned to Dr. Kunstle's opinions. The court finds no error on this issue.

D.     Assessment of Ms. Rael's Mother's Opinion

Ms. Rael alleges that the ALJ failed to assess her mother's opinion of her ability to function. The record contains a signed unsworn "Function Report – Adult" form completed by Antonia Soto, who identified herself as Ms. Rael's mother. (*See* Adult Third Party Function Report (Doc. # 11-6 at 26-33 of 43)). Ms. Rael argues that her mother's opinion "clearly ha[d] an effect on [her] case because it supports [her] statements regarding her ability to function." (*See* Doc. # 15 at 37-38 of 40).

As Ms. Rael's mother is an "other source" under SSR 06-03p, 2006 WL 2329939, at *2, the ALJ could, but was not required to, consider her submission and how much weight to afford it. *Smith v. Commissioner of Social Security*, No. 3:12-cv-602, 2013 WL 5316766, at * 19 (N.D. Ohio Sept. 23, 2013). While the ALJ evaluated evidence provided by "third parties," he did not explicitly discuss the opinion of Ms. Rael's mother. (See Doc. # 11-2 at 19 of 45). This omission is not grounds for remand, as her opinion was largely cumulative of her daughter's testimony. Ms. Rael admits and the record shows that her mother's opinion was merely "consistent with" her own statements. (*See* Doc. # 15 at 38 of 40 n.6). The ALJ's reasons for

15

finding Plaintiff's testimony not entirely credible would likewise apply to her mother's opinion. Even if an ALJ does not address a family member's statements regarding a claimant's disability claim, there is no cause for remand where the ALJ considered similar claims by the claimant and adequately rejected them. *See Best-Willie v. Colvin*, 514 F. App'x 728, 736 (10th Cir. 2013) (concluding that although the ALJ's decision did not expressly address lay witness evidence, any error in failing to do so was harmless because the same evidence that the ALJ referred to in discrediting plaintiff's claims also discredited the lay witness's claims) (internal quotation marks and citation omitted); *Smith v. Commissioner of Social Security*, No. 3:12-cv-602, 2013 WL 5316766, at *3 (N.D.Ohio Sept. 23, 2013) (finding ALJ not required to consider the testimony of claimant's mother); *Moore v. Commissioner of Social Security*, No. 1:06-cv-780, 2010 WL 2400045, at * 9 (S.D. Ohio May 17, 2010) (affirming decision where the record did not corroborate the testimony of lay witnesses who were not impartial and who relied on plaintiff's subjective allegations for their opinions).

"Further, where, as here, the ALJ's decision states and demonstrates that he considered all of the evidence, our general practice, which we see no reason to depart from here, is to take [the] lower tribunal at its word." *Davis v. Astrue*, No. 06-7047, 237 F. App'x 339, at *3 (10th Cir. June 12, 2007) (internal quotation marks and citations omitted). (See Doc. # 11-2 at 16, 18-19, 23 of 45 (ALJ considered "the entire record" and "the evidence in its entirety"). Ms. Rael does not point to anything in her mother's opinion that is not largely cumulative of her own testimony and would thus fall outside the holding of *Davis*. *See Perkins v. Colvin*, No. 12-2219-JWL, 2013 WL 4517295, at * 5 (D. Kan. Aug. 26, 2103) (finding no error in the ALJ's failure to discuss third party opinions). The court finds no error on this issue.

E.  Occurrence of Jobs

Ms. Real argues that the ALJ "did not properly assess if jobs exist in significant numbers that plaintiff would be capable of performing." (*See* Doc. # 15 at 17 of 40). At step five of the sequential evaluation process, "the ALJ must decide whether the claimant can perform any other gainful and substantial work that exists in the national economy," based on her "age, education, work experience, and RFC." *Taylor v. Astrue*, No. 11-cv-01425-CMA, 2012 WL 1520179, at * 7 (D. Colo. Apr. 30, 2012). Federal statute defines "work which exists in the national economy" as "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A). The Tenth Circuit "has never drawn a bright line establishing the number of jobs necessary to constitute a 'significant number.'" *Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir. 1992). "[T]he proper evaluation of significant numbers" depends upon factors such as "the level of the claimant's disability; the reliability of the vocational expert's testimony; the distance claimant is capable of traveling to engage in the assigned work; the isolated nature of the jobs; [and] the types and availability of such work," and "should ultimately be left to the ALJ's common sense in weighing the statutory language as applied to a particular claimant's factual situation." *Trimiar*, 966 F.2d at 1330 (internal quotation marks and citations omitted).

The ALJ need not expressly apply the factors where the record supports the existence of a significant number of jobs in the national economy. Federal statute refers to work existing in the national economy, "regardless of whether such work exists in the immediate area in which [the claimant] lives." 42 U.S.C. § 423(d)(2)(A). *See Raymond v. Astrue,* 621 F.3d 1269, 1274 (10th Cir. 2009) ("the controlling statutes, federal regulations, and case law all indicate that the proper focus generally must be on jobs in the national, not regional, economy"); *Wendelin v.*

17

*Astrue*, No. 09-1211, 2010 WL 582639, at ** 2-3 (10th Cir. Feb. 19, 2010) (declining to remand based on challenge to number of jobs available in Colorado) (citing *Jensen v. Barnhart*, 436 F.3d 1163, 1168 (10th Cir.2005) ("The Commissioner met [his] step-five burden of proving that there are sufficient jobs in the national economy for a hypothetical person with [the claimant's] impairments."); *Harmon v. Apfel*, 168 F.3d 289, 292 (6th Cir.1999) ("The Commissioner is not required to show that job opportunities exist within the local area.").

Based on vocational expert testimony, the ALJ found that Ms. Rael would be capable of performing an aggregate number of 20,973 jobs in the national economy, a number that the ALJ found to be significant. (See Doc. # 11-2 at 24 of 45). Ms. Rael argues that the ALJ was required to expressly apply the factors mentioned in *Trimiar,* 966 F.2d at 1330, because the number jobs identified in Colorado, 525, is relatively small. She cites only the number of jobs in Colorado. Ms. Rael does not argue that the numbers of jobs nationally is not "significant." The Tenth Circuit has held that 11,000 jobs in the national economy qualify as "substantial" to support the ALJ's step five finding. *Rogers v. Astrue*, 312 F. App'x 138, 142 (10th Cir. 2009). The court finds no error on this issue.

IV.   Conclusion

The court is satisfied that the ALJ considered all relevant facts and that the record contains substantial evidence from which the Commissioner could properly conclude under the law and regulations that Ms. Rael was not disabled within the meaning of Title XVI of the Social Security Act and therefore not eligible to receive Supplemental Security Income benefits. Accordingly, IT IS ORDERED that the Commissioner's final decision is AFFIRMED and this civil action is DISMISSED, with each party to bear her own attorney fees and costs.

DATED at Denver, Colorado, this 23rd day of September, 2014.

                                BY THE COURT:

                                <u>s/Craig B. Shaffer</u>
                                United States Magistrate Judge